DORR (WIGGIN v.). See Case No. 17,625.

DORR (WILLARD v.). See Cases Nos. 17,-679 and 17,680.

DORR MANUF'G CO. (ESSEX HOSIERY MANUF'G CO. v.). See Case No. 4,533.

DORRANCE (VANHORN v.). See Case No 16,857.

DORRIS, The. See Case No. 9,225.

## Case No. 4,011.

### DORRIS v. COPELIN.

[5 Am. Law Reg. (N. S.) 492.]

District Court, E. D. Missouri. Nov. Term, 1865.

Shipping—Bill of Lading—River Steamer—Lighterage and Reshipping.

1. A bill of lading given by a steamer navigating the western rivers, which contains the "privileges of lighting and reshipping," will be construed as granting to the vessel the privilege of reshipping during the voyage, according as its interest or convenience may advise, and as at the same time imposing upon it the duty to do so when practicable and necessary.

2. The privilege cannot be exercised before the voyage has been undertaken or commenced by the original vessel. It would not justify the steamer, which gives such a bill of lading, in shipping and transporting the cargo by another vessel. In this there would be such a departure from the contract as would render the original vessel liable as insurer.

[Cited in Marx v. National Steamship Co., 22 Fed. 684.]

3. Lighterage does not apply to overloading at the commencement of a voyage.

In admiralty. On exceptions to libel.

James O. Broadhead, for libellant.

J. H. Rankin, for respondent.

TREAT, District Judge. This is a suit on a contract of affreightment, by which the respondent agreed to transport, on the steamer Benton, from St. Louis to Fort Benton, the cargo named in the bill of lading, with the "privileges of lighting and reshipping." The cargo was delivered to the Benton at St. Louis, and by her, before leaving port or commencing the voyage, shipped on another steamer, which, with the cargo, was lost by an excepted peril. The questions raised relate to the rights, duties, and privileges of the boat and owners under the clause quoted. The right and duty of a master to tranship when the vessel receives a deadly wound, or cannot, from an excepted peril, prosecute the voyage, are well settled. "The privilege of reshipping" is obviously for the purpose of securing some authority which otherwise would not exist,—a privilege which has become very important in the navigation of western rivers. Steamers of different draft and capacity are required in different departments of western commerce, owing to the shallowness of water in some rivers, and to rapids in others. A steamer which can make a voyage at one state of a river, may not be able, at another, to reach the port of destination; and instead of waiting indefinitely for a rise, needs the privilege of forwarding the cargo on another steamer of lighter draft. It is well known that the condition of some western rivers changes very suddenly; and unless the contract of affreightment makes provision therefor, serious disputes must arise between the shipper and vessel, and great embarrassments ensue. Hence the clause in question is not of unfrequent occurrence. The adjudications upon its force and effect, however, are few, and not always consistent with each other. It seems to be well settled that when a reshipment is made on a good boat under such a clause, the original vessel continues liable under its contract for the safe delivery of the cargo at the port of destination, just as if the cargo had gone forward on the original bottom. The original vessel continues liable for all losses not within the excepted perils, and the shipper is not responsible for extra freight, as in cases of transhipment under the general law. The rules governing contracts of affreightment differ in no essential respect from those controlling other contracts. The contracting party must do what he agrees to do, according to the terms of his undertaking. If he departs from his agreement, he becomes an insurer. One vessel may be selected by the shipper in preference to all others, for reasons satisfactory to himself, and founded on the quality of the vessel, the character of her officers, the facility for procuring insurance, &c.; and if the cargo is sent forward on a different vessel, the responsibilities of an insurer arise. Dunseth v. Wade, 2 Scam. 285; McGregor v. Kilgore, 6 Hammond, 358; Wilcox v. Parmelee, 3 Sandf. 610; Fland. Shipp. § 481; Whitesides v. Russell, 8 Watts & S. 44; Pars. Merc.

Law, 124, note, 218, note; Dalzell v. The Saxon, 10 La. Ann. 280.

Whether such a clause imposes a duty as well as grants a privilege is not fully settled. In Louisiana (Hatchett v. The Compromise, 12 La. Ann. 783) it is construed as obligatory; —that is, if the vessel cannot make the voyage within a reasonable time, it must reship, when practicable and necessary, at its own expense; and that low water is not an excepted peril. In Broadwell v. Butler [Case No. 1,910], also in Sturgess v. The Columbus, 23 Mo. 230, it is held that the clause is a mere privilege, to be exercised or not; but that custom may be proved to explain the force of the terms. Without the aid given by the foregoing authorities, the rights and duties of the master are easily deducible from general principles. The master under the ordinary contract of affreightment must transport the goods in his own vessel, unless prevented by an excepted peril. Under certain circumstances he must tranship—that is, when the voyage is broken up by an excepted peril; and the cost of the transhipment, beyond the original freight-money, falls upon the cargo. He has no right to reship merely to suit his own convenience or interest; for within the excepted perils, the shipper contracts to have the cargo go forward in the original vessel. If he wishes "the privilege of reshipping," he must specially contract therefor. Treating the clause, therefore, in connection with the reasons for its insertion, it must be considered as granting to the original vessel the privilege of reshipping during the voyage at its convenience; and as, at the same time, imposing the duty to do so when practicable and necessary. If no special exception therefor be inserted, the contract calls for the delivery of the cargo within a reasonable time, to be ascertained, when the privilege to reship exists, by the practicability of sending it forward on the original or some other vessel. It is not to be supposed that the shipper concedes the privilege, if the vessel may detain the cargo indefinitely, waiting for high water, when vessels of less draft are making the voyage daily. It is a privilege with corresponding obligations. The master may earn freight by proceeding on his own vessel as far as practicable, and then using another for the completion of the voyage. He is not bound to reship, if he can complete the destined voyage; but he may do so. He must, however, send the cargo forward without unreasonable delay, either on his own or another vessel.

The contract implies also that the voyage shall be undertaken, or commenced, by the original vessel; else why the agreement to transport on the Benton at all, or why not an agreement with her owner or master, to transport the cargo on any vessel, or to transport generally, without reference to the vehicle or means of transportation? It is well known that a voyage from St. Louis to Fort Benton is not unattended with difficulties, owing to the sudden rise and fall of the Missouri river, and to the necessity of strong and powerful boats. A part of that voyage —say from St. Louis to St. Joseph or Council Bluffs—may often be performed by a large boat, when for the residue of the voyage one of lighter draft will be needed. Shall the shipper have no benefit from his selection of the boat which is to undertake the voyage? He concedes the privilege of re-shipment, so as to relieve the master of the duty to complete the voyage on the original vessel; but can that be justly termed a re-shipment which is, for all practical purposes, the original shipment? Has the steamer Benton performed her contract by simply lying at the St. Louis wharf and having the cargo rolled across her decks to a steamer by her side, or by going through the useless show of putting the cargo into her hold and immediately hoisting it therefrom and transferring it to another boat, without having turned a wheel or unfastened her moorings? Is such a transaction different in any essential particular from a direct loading of the cargo, in the first instance, on the other vessel?

As the main point presented by the exceptions in this case is, so far as known, now to be decided for the first time, and as the views of the courts which have passed upon some questions arising under a similar clause are not in entire accord, it is well to consider the subject in connection with the origin of such a clause, the necessities from which it springs, the nature of the inland navigation to which it generally applies, and the real intentions of the shipper and shipowner. A voyage, for instance, from New Orleans to St. Paul by a boat usually employed in the New Orleans trade, would be impracticable during many months in the year; yet some of the lower river boats might at times accomplish the object. The boat-owner thinking from the stage of the river such a voyage practicable, may contract in New Orleans to deliver cargo on his boat at St. Paul. If none but the usual exceptions were inserted in the bill of lading, low water would not be an excuse for nonperformance, or for sending forward the cargo on another boat.

The case of Collier v. Swinney, 16 Mo. 484, illustrates the doctrine. The voyage would have to be made by the original vessel within a reasonable time, unless prevented by a recognised peril, within the exceptions. The shipper might prefer to have his cargo go forward without breaking bulk or rehandling. The boat-owner, however, being unwilling to enter into an unqualified obligation to that extent, asks the privilege of reshipping; and it is conceded. What is meant by that qualification? That the original vessel shall do nothing, or that she shall undertake the voyage in good faith? It is generally the case that western boats take large cargoes, belonging to many different persons, procured at different places along the river, and delivered at different ports. It may be of great im-

portance, sometimes, for a boat to have the privilege of reshipping even when the voyage could be made without delay or difficulty; for a full return cargo may be offered at an intermediate port, and the cost of continuing the original voyage with the little cargo still on board, would far exceed the freight-money. Hence the shipowner needs the privilege of "reshipping," so as to secure the profitable use of his vessel under all the shifting exigencies of a long coasting voyage; and the shipper is interested in having his goods sent forward in safety and with as little delay as practicable. Low water may cause a delay equally pernicious to shipper and shipowner. For their mutual benefit, based on the character of our river navigation, and each party having a common object in view, viz.: the safe and speedy transportation of the cargo,— the clause for "reshipment" is inserted in the contract, and becomes one of its important elements. Like all mutual agreements of that description, it implies a duty. The contract by the shipowner is, then, that he will transport the goods in a reasonable time to their destined port, on his own vessel, or by reshipping when necessary and practicable. He can consult his own interest and convenience so far as earning freight is concerned, by reshipping at any point during the voyage; and at the same time must consult the interests of the shipper by expediting the transportation, even by resort to another vessel, if from low water or other causes the original vessel cannot go forward, safely or expeditiously.

The maritime rules applicable to navigation of the high seas, if applied with technical rigor to all cases on the western rivers, would frequently work gross injustice to all parties in interest. It is apparent that many of those rules require modifications, or rather modified and entirely new applications. A history of the decisions as to "deviations," especially in the supreme court of Missouri, illustrates the difficulties and embarrassments to shippers and shipowners in the west, when such technical rulings are rigidly adhered to, without due regard to underlying and fundamental principles. Those technical rules for sea voyages are correct applications of sound principles to the facts and circumstances attending such navigation; but an adherence to such technical rules, regardless of the peculiarities of western river navigation, is a sacrifice of principle to inapplicable precedents—is a perversion or change of the contract as made between the parties. They contract with reference to a particular voyage and mode of transportation. differing in important respects from an open sea voyage. Generally the master, shipper, and shipowner can have prompt communication with each other. The necessity of sacrificing the cargo to procure supplies for finishing the voyage, or the means of repairing the vessel when damaged by unavoidable accident, seldom

occurs. Hence the master's duties vary, or rather the power inherent in his position is rarely called into rightful action, so far as selling the cargo or vessel is concerned. Hence some courts in the west have been liberal in allowing proof of custom; and still more liberal in relaxing the strict rules concerning the nature and proof of custom: or, if the courts lay down the rigid rule, juries in common-law cases find the existence of the custom on slender proofs. All of this indicates merely a positive conviction in the minds of judges and juries, that a technical and strict following of inapplicable precedents would defeat the object of the law, and the real intention of the parties. In maritime as well as other contracts the intention of the parties—the substance instead of the shadow—should control the interpretation. Most of the maritime rules have sprung from the necessities of commerce. Vessels "are made to plough the seas and not to rot by the wall;" and hence whatever is necessary to the successful use of the vessel has been encouraged and enforced by legal tribunals, until a system of rules has ripened into existence and become recognised in all maritime countries. Those rules sprung from, and are peculiarly applicable to, foreign sea-voyages; yet most of them are equally applicable to river navigation in the west. Under the United States constitution, inter-state navigation is cognisable by federal tribunals, and governed by general, not local, rules and legislation. The United States supreme court has frequently decided, that mercantile contracts are to be interpreted in United States courts by general mercantile law, not by the peculiarities springing from state or local legislation. Taking, then, the fundamental principles controlling contracts of affreightment and applying them fairly and justly to such contracts for transportation on western rivers, there will be no conflict of authority and no departure from established rules. But courts must not close their eyes to essential differences in the nature of special contracts, nor to the real character of the subject-matter. A contract made with reference to one transaction must not be interpreted as if made with reference to an entirely different object. Such a course would be "to stick in the bark"—to sacrifice the substance to the form—right to show—the spirit to the letter. The ancient and modern rules governing building-contracts illustrate the advance of jurisprudence and the adaptation of law to the shifting exigencies of society and business pursuits. "Adjudications," or "precedents," as they are termed, are never to be departed from on slight grounds; but are to be considered for the purpose of ascertaining the principle recognised; not to be followed blindly, regardless of the new elements a case may contain.

The clause in western bills of lading securing the privilege of reshipping and of light-

erage has sprung from the peculiarities and necessities of western navigation; which, if ignored in interpretation, would work an entire change in the contract; defeating the end sought to be effected, viz.: the safe and speedy transportation of cargoes, to the benefit of both shipper and shipowner. The shipowner can now, under that clause, contract with safety for the transportation of cargoes from Pittsburgh or New Orleans even to Fort Benton in Montana; and such a contract binds him to deliver the goods at the destined port, by his own or some other vessel, so soon as he reasonably can. If during the voyage there is a fall in the river under such circumstances as renders it improbable that the original vessel can complete the voyage within a reasonable time, or during that season, and another boat of lighter draft can and does make the voyage and is willing to take the cargo, it would hardly be considered a fair performance of the contract to hold on to the original cargo with the hope of pursuing the voyage the following year, and in the mean time keep it on board subject to the usual dangers attendant upon the breaking up of ice in spring, or to store it over winter at an inaccessible place, subject to great loss in value, or to its destruction if perishable. The shipper contracts for a delivery in a reasonable time according to the usual course of navigation on the specified river or rivers, and the vessel is bound, in good faith, to fulfil the contract according to its tenor. If no clause for "reshipment" were inserted, the vessel would have to take forward the goods on its own bottom; for it would then appear that both parties agreed thereto. If necessary delay resulted therefrom, such delay would be a necessary incident to the contract the parties chose to make. A delivery of goods for such a voyage at a particular season of the year, ought, so far as delays are concerned, to be considered in connection with the difficulties of navigation at such a season. A delivery for a voyage to Fort Benton, for instance, if made at St. Louis in midwinter, would not imply that the cargo was to be landed at Fort Benton in as few weeks thereafter as if delivered in the spring, when the Missouri river is free from ice and the vessel would meet the June rise on the upper Missouri. A delivery for transportation the whole distance on one vessel would subject shipper and shipowner to the necessary incidents of such a voyage; for they could, if they desired, insert the clause for lighterage and reshipment. They can make their contract as they desire to have it; and when made must abide by its terms.

In this case the respondent bound himself to undertake the voyage on the steamer Benton, and secured the right to re-ship. He did not commence the voyage as agreed, nor did he, within the true meaning of his contract, re-ship; for re-shipment implies a previous shipment. Practically, the goods delivered for the steamer Benton were never shipped on her at all; and consequently were never re-shipped by her. The argument of respondent's proctor, that the "privilege of lighting" should be treated as covering this case, involves a misapplication of terms. "Lighterage" has a distinct meaning, and does not apply to overloading at the commencement of a voyage. If it be true that the steamer Benton contracted for a larger cargo than she could carry, the consequences of such greed must fall, not on the shipper, but on herself. The owners of the cargo who may have procured insurance for their shipments on that vessel could not be thus deprived of the benefits for which they stipulated. It is not a "lighting" of a vessel, to take more cargo than she can carry and then transport the excess on a "lighter." Such action is neither "lighting," nor, in the true meaning of such a contract, a "re-shipment." The rule and reasons therefor may be thus succinctly recapitulated:—Inasmuch as a vessel which cannot perform a stipulated voyage within a reasonable time in consequence of low water, or which may not be able to complete a voyage when commenced, in consequence of a fall in the river; and inasmuch as low water is not a peril of the river within the meaning of an ordinary contract of affreightment, whereby the right or duty of transhipment at the expense of the shipper arises; the mutual interests of both shipper and shipowner often lead to a special clause or contract concerning lighting and re-shipping. Each of the contracting parties expects to be benefited thereby. The shipper seeks to avoid the delays incident to navigation by that particular class of boats on the specified route. His object is to secure the speedy and safe transportation of his goods; and for that purpose he is willing that the vessel on which the shipment is made, may, if during the voyage the master deems it necessary or proper, re-ship on some other good vessel. His interests are thus promoted: the original vessel being still liable on her contract, for the delivery of the cargo, within the excepted perils. On the other hand, the shipowner may, for satisfactory reasons, either of interest or convenience, wish to abandon an uncompleted voyage without loss of freight pro rata itineris, and without becoming an insurer. He, therefore, agrees to the special clause. Each contracting party thus secures himself against a contingency. Each is benefited by the arrangement if mutual good faith is observed; and each has a right to insist upon the terms of the contract. It is not unilateral, or one-sided—a mere privilege without corresponding obligations. It becomes as much a part of the mutual contract as any other provision in it. The shipowner cannot hold the cargo indefinitely, although it may be perishable, or the loss of a market may follow, and defend his action

on the ground, that inasmuch as the clause is a "privilege," it is for him, regardless of the interests of the shipper, to act upon it or not. The relation which binds the ship to the cargo would be thus annihilated, and the shipper placed at the mercy of the master or shipowner. So the shipper cannot insist upon having the vessel proceed on the voyage, regardless of expense and hazards. It is well known that other interests are often intimately associated with the voyage—as those of the underwriters, consignors, and vendors. The rules governing such contracts should be sufficiently comprehensive to include and protect the rights of all. The old contracts of affreightment, policies of marine insurance, power of masters over the vessel and cargo, not being strictly applicable in all particulars to other than foreign sea-voyages, have been largely varied when used in connection with inter-state navigation on our western rivers, so as to adapt them to the necessities of such river commerce. Adherence to the principles on which all such contracts rest, demands their application to the rightful ends for which they exist. The custom of the rivers and the introduction of special clauses in contracts of affreightment, the modifications of policies of insurance, &c., have been gradually working out their needed adaptation to the exigencies of river navigation. Although a river voyage from a port in one state to a port in another, is considered, for some purposes, a foreign voyage, and the rules applicable thereto enforced; yet, in many respects, it differs essentially from a foreign sea-voyage. To ignore those differences would be to overturn sound principles and destroy right and justice.

The clause concerning lighting and reshipment thus interpreted with due regard to the intention of the parties and the peculiarities of river navigation, is beneficial to all concerned and promotive of commerce. It deals justly with the shipper and shipowner. Hence, it must be held to give to the shipowner the right, during a voyage, to re-ship for his own interest and convenience, and to impose on him the duty of so doing when practicable and necessary. The privilege to re-ship is not the privilege of converting the original vessel into a mere receiving-ship—to have her hold out the false inducement that the voyage is to be undertaken by her, and thus mislead the shipper into making all collateral arrangements and contracts, as of insurance, &c., to the destruction of his interests. A shipment on a specified steamer for a prescribed voyage with the privilege of reshipment, implies that the original steamer shall undertake the voyage—that the privilege may be exercised during the voyage, and not before—that there shall be an actual and not a merely ostensible shipment in the first case. By the ordinary contract the shipowner is bound to take the cargo to the port of destination on the boat named, so soon as he reasonably can, the perils of the river excepted. To send the goods forward within a reasonable time as stipulated, on his own or some other vessel, he secures the privilege of re-shipment,—that is, exemption from the obligation to send them forward on the boat named. He secures no other exemption. All his other obligations are intact. He must still transport the cargo in a reasonable time, either on his own or another vessel. subject to all the other conditions and obligations of the ordinary contract. If he fails to do so, a breach of the contract occurs, for which he is liable.